UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TREVOR J. SCHLEICHER,

               Plaintiff,                           Case No. 14-10729

v.                                          Paul D. Borman
                                          United States District Judge

PREFERRED SOLUTIONS, INC.,

               Defendant.

_____/

OPINION AND ORDER GRANTING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 39) AND
DISMISSING PLAINTIFF'S STATE LAW CLAIMS WITHOUT PREJUDICE

Now before the Court is Defendant Preferred Solutions, Inc.'s ("Preferred")

Motion for Summary Judgment that was filed on January 23, 2015. (ECF No. 39).

Plaintiff Trevor Schleicher ("Plaintiff") responded on February 13, 2015. (ECF No. 43).

Thereafter, Preferred filed a reply. (ECF No. 47).

A hearing on this matter was held on April 23, 2015. For the reasons set forth

below, the Court will GRANT Defendant's Motion for Summary Judgment as to

Plaintiff's Equal Pay Act claim and decline supplemental jurisdiction over Plaintiff's

remaining state law claims.

# I. BACKGROUND

A.    <u>Hiring</u>

In April 2008, Defendant Preferred Solutions, Inc. was in the business of general information technology staffing.  (Def.'s Ex. 1, Seipenko Dep. at 12)[1].  Preferred's CEO, Marie Seipenko, testified that she had attempted to transition her company from a generalist informational technology ("IT") staffing firm into an IT staffing firm with a "niche", but had failed to find success in legal or school specific markets prior to 2008.  (*Id*. at 11-12).

In 2006, Seipenko hired Susan Piotrowski as a Vice President and tasked her with selling IT staffing services and also "mov[ing] the organization into some new areas and strategically position them for new services."  (Ex. 2, Piotrowski Dep. at 20:15-17).  Piotrowski and Plaintiff previously worked together, and Piotrowski (at that time) considered him to be a friend.  (Piotrowski Dep. at 19).  Piotrowski introduced Plaintiff to Seipenko in January 2007 which resulted in a lunch meeting between the two, and they "started building a relationship together, getting to know each other".  (Ex. 6, Plaintiff Dep. at 19:12-13; Seipenko Dep. at 23).  Thereafter, the two had multiple "get-togethers" and Plaintiff learned more about Seipenko and Preferred's business.  (Pl. Dep. at 19; Seipenko Dep. at 18-21).

---

[1] Unless otherwise noted, all references to exhibits refer to those exhibits attached to Defendant's Motion for Summary Judgment (ECF No. 39).

Plaintiff asserts that Preferred wanted to break into the electronic medical records ("EMR") niche and he was positioned to help them with that endeavor because he was working for Acro (a different IT firm) and was actively selling training and go-live services to hospitals and healthcare providers that were converting to EMR using a hardware/software platform called Eclipsys.  (Pl. Dep. at 24).  In a nutshell, Plaintiff's business involved targeting hospitals and healthcare providers that needed to convert to EMR, selling them a software or hardware EMR product ("Eclipsys"), and supplying the independent consultants that would go on-site to train the healthcare workers regarding the new program, and providing 'go-live' support when the program launched.  (Pl. Dep. at 55).  Katrina Purdy worked with Plaintiff at Acro by recruiting the consultants.  (Pl.'s Ex. F, Purdy Decl. at 1-2).  Piotrowski was aware that Plaintiff was having great success at Acro within this market.  (Pl. Dep. at 17).

Whether Preferred had established any clients in this market before Plaintiff was hired in 2009, and whether Preferred secured these clients without Plaintiff's direct help, is a disputed fact.  Preferred maintains that Seipenko and Piotrowski decided to pursue the EMR niche, independent and regardless of Plaintiff, in April 2008.  Plaintiff claims that Preferred's pursuit of the EMR niche was his idea, but conceded that Piotrowski "probably started doing some ground work stuff in '08."  (Pl. Dep. at 29:7-8).  Preferred claims that it had established EMR business in its books, sold by Piotrowski, prior to Plaintiff joining in 2009.  (Piotrowski Dep. at 23-25, 35; Seipenko Dep. at 11-13, 18, 45-49).  However, it is undisputed that before officially working for Preferred (and while still

3

at Acro) Plaintiff was helping Piotrowski in her attempts to break into the EMR niche market.  (Piotrowski Dep. at 28; Pl. Dep. at 56; *see also* Pl.'s Ex. G, 4/2008 Email between Piotrowski and Plaintiff).  Piotrowski's endeavors in the EMR market prior to 2009 involved a different software/hardware platform program known as Cerner.  (Piotrowski Dep. at 28; Pl. Dep. at 56).  In April 2008, Plaintiff met with Seipenko and discussed the EMR IT staffing business.  (Seipenko Dep. at 20-23; Ex. 3, 4/2008 Note reflecting meeting).

In 2009, Plaintiff became disenchanted with his employment at Acro because he believed his coworker, Katrina Purdy, had been wrongfully denied commissions that she was owed.  (Pl. Dep. as 177; Seipenko Dep. at 23-24; Purdy Decl. at 1).  As a result, Plaintiff contacted Seipenko and Piotrowski and a decision was made that both Purdy and Plaintiff would leave Acro and come over to Preferred as a "package deal".  (Pl. Dep. at 38, 60; Seipenko Dep. at 23-26; Purdy Decl. at 1-2).  At some point, Seipenko also promised Plaintiff and Purdy that she would never cut their compensation without cause.  (Pl. Dep. at 265-66; Seipenko Dep. at 25-26; 233-34; Purdy Decl. at 1).

Later in 2009, Purdy left Acro and was hired by Preferred.  (Purdy Decl. at 1-2).  Plaintiff explained that he left Acro in 2009 but was not immediately hired by Preferred.  Plaintiff initially created his own company because of a non-compete in place with Acro that prevented him from working for Preferred immediately.  Plaintiff testified that he was working for Preferred, through that company, prior to being formally hired in September 2009.  (Pl. Dep. at 38; Seipenko Dep. at 35).

4

Plaintiff filled out an Employment Application for Preferred on September 23, 2009. (Ex. 7). That Employment Application stated, in relevant part: "I understand and agree that my employment and compensation are for no definite period and may, regardless of time and manner of payment of my wages and salary, be terminated by me or the Company, with or without cause, and without any previous notice." (*Id.*). Thereafter, on September 30, 2009, Plaintiff executed an Employment Agreement with Preferred. (Pl.'s Ex. R). That contract indicated that Plaintiff's employment was "at-will" and also that the Employment Agreement represented "the entire agreement and understanding of and between the parties with respect to the matter covered herein. There are no other promises, agreements, representations, statements or understandings between them..." (*Id.* at ¶¶ 2, 8).

Plaintiff was formally hired by Preferred as a Planning and Implementation Manager. (Seipenko Dep. at 12). Despite different titles, it was understood that both Plaintiff and Piotrowski would both be "co-selling and co-leading activities and growth targeted at the health information technology space." (Piotrowski Dep. at 49:8-10). Plaintiff and Piotrowski were the only sales people for HIT staffing services in 2009 (at some point Christ Kulpa was hired in a sales capacity). (Pl. Dep. at 73; Ex. 18, Seipenko Decl. at ¶ 4). Plaintiff's primary role at Preferred was to sell HIT services. (Pl. Dep. at 62, 73-74; 149; 326-27; Seipenko Dep. at 19-21). Plaintiff also maintains that his role in building Preferred's HIT practice was bringing the "vision", i.e. identifying the niche

5

market and separating the recruiting and selling components of the job.  (Pl. Dep. at 65-66).

B.    Compensation

Prior to being formally hired by Preferred in September 2009, Plaintiff and Seipenko discussed compensation.  Plaintiff suggested that his and Piotrowski's commissions would be paid not based on what they individually sold but rather calculated based a "pool" concept: their commissions were to be determined by the gross profits of the HIT business.  (Pl. Dep. at 75-76; Seipenko Dep. at 69).  More specifically, Plaintiff and Piotrowski's commissions were based on the gross profits created by the HIT business and not directly tied to their individual effort or individual sales.  (Piotrowski Dep. at 122-23; Pl. Dep. at 299-300).  This team or pool model allowed them trade to client accounts based on the volume of business and also allowed one person to concentrate on program management when needed.  (Piotrowski Dep. at 122-123).  There were no individual metrics or sales requirements.  (Pl. Dep. at 78-79).  Piotrowski testified that the "pool" commissions concept was Plaintiff's idea.  (Piotrowski Dep. at 47-48).

The gross profits of the HIT business were calculated by subtracting either 120% of the compensation that was paid to Preferred's consultants if they were "W-2 employees" or subtracting 107% of the compensation if the employee was an independent contractor paid through a 1099; more simply: the gross profits were revenue minus the manpower expenses.  (Pl. Dep. at 78-79).

6

Seipenko originally offered to pay Plaintiff a base salary of $100,000 and 10% commissions of the pool. (Pl. Dep. at 76). Plaintiff rejected this offer and suggested that he be paid on a commission only basis. (Pl. Dep. at 76-77; Seipenko at 74). Seipenko agreed to this compensation model and agreed to pay Plaintiff 20% of the gross profits of the HIT business "pool" with no guaranteed base salary. (Seipenko at 69, 74-75).

Prior to Plaintiff and Purdy's hire in 2009, Piotrowski had been paid $100,000 base salary and 20% commissions based on her own sales. (Seipenko Dep. at 78). When Purdy and Plaintiff were hired, Piotrowski's pay structure was changed to $100,000 base salary and 10% of the gross profits of the HIT business pool. (*Id*.; Piotrowski Dep. at 46-47). Piotrowski explained that her compensation changed based in part upon the fact that Purdy would be taking over her recruiting duties. (*Id*.; Piotrowski Dep. at 46-47).

Seipenko also offered Piotrowski the opportunity to be paid the same as Plaintiff and receive 20% commissions of the gross profits of the HIT business pool and no base salary, but she declined ostensibly because it was too risky. (Piotrowski at 140-41; Seipenko Dep. at 237-38). Piotrowski explained that at that time she had children in college, was going through a divorce, and was not interested a commission-only pay structure. (*Id*.). Plaintiff corroborated Piotrowski's testimony, explaining that Piotrowski "wouldn't touch [the a commission only pay structure] with a 10-foot pole. I mean, she was absolutely – she was not willing to take that sort of risk." (Pl. Dep. at 81:15-17). Even later when she knew that Plaintiff was making much more money than she was, based on his compensation structure, Piotrowski never asked to be switched to a

20% commission model nor did she complain about the pay differential. (Piotrowski Dep. at 121). Piotrowski explained, "My feeling was that he negotiated a deal, he took a risk at the time, and good for him, it was paying off." (Piotrowski at 120:22-24). At the time Plaintiff and Piotrowski chose their compensation structures, Seipenko did not know who would make more money because their income would be dictated by the profits of the HIT business. (Seipenko Dep. at 238).

There was no written agreement between Plaintiff and Preferred regarding the rate or structure of Plaintiff's compensation. (Pl. at 96; 267, Seipenko at 69). Plaintiff was paid 20% of the gross profits of the HIT business for more than three years. Also, it is undisputed that Plaintiff and Seipenko made no agreements, written or verbal, regarding his commissions upon separation from his employment. (Seipenko Dep. at 89; Pl. Dep. at 97).

C.   Employment

In the last quarter of 2009, Preferred's HIT business revenue was $892,940.22, but by the end of 2010, Preferred's HIT business revenue was $8,543,443.12. (Pl.'s Ex. D). Those numbers continued to increase and Preferred had 13.1 million in HIT revenue in 2011, 16.6 million in 2012, 11.4 million in 2013, and 12.7 million for the first half of 2014. (*Id*.). Seipenko admits that prior to 2010, Preferred's highest revenue was $6.8 million in 1999. (Seipenko Dep. at 26).

Piotrowski observed that in 2010 and 2011, much of Preferred's HIT business was generated by referrals and that she and Plaintiff were both very busy. (Piotrowski Dep. at

53; Seipenko Dep. at 110). This resulted in Plaintiff and Piotrowski spending most of their time project managing rather than actively selling. (Piotrowski Dep. at 53; Pl. Dep. at 102-03, stating that in 2012 he managed their largest account the entire year). Therefore, in 2012, Plaintiff and Piotrowski requested that Seipenko hire more staff. (Pl. Dep. at 149-51; Seipenko, 100, 102-03; Piotrowski Dep. at 54). In response to the booming business and Plaintiff and Piotrowski's request, Seipenko hired Jeri Garner and Kyle Larner in June or July 2012 to do project management and to free up Plaintiff and Piotrowski to concentrate on selling. (Seipenko 102-03; Pl. Dep. at 150-51).

In 2012, problems begin to surface between Seipenko and Plaintiff as well as between Piotrowski and Plaintiff. Seipenko received complaints from two of the consultants Plaintiff worked with, regarding his treatment of them. Seipenko also counseled Plaintiff regarding his long lunch hours, turning his phone off during business hours while he was at the gym, and his failure to return a client's phone call. (Seipenko Dep. at 118, 120-22). Plaintiff disputes that he was aware of these issues. (Pl. Dep. at 153). Seipenko testified that "everyone" began to complain about Plaintiff not pulling his weight and that she had conversations with him regarding his failure to sell. (Seipenko 107-08). Seipenko claims that Plaintiff repeatedly told her that he did not need to sell and that he was hired to build a practice rather than sell, and that it was Sue's turn to sell. (Seipenko Dep. at 108, 138). Seipenko also claims that everyone in Preferred's HIT business was nervous about their job security in late 2012 and 2013 because they were "losing more deals consistently"– the business was more competitive, and there were

fewer sales. (*Id*. at 136-38).

Piotrowski also testified that in 2012 Plaintiff's head "started to explode" because he was "king of the totem pole" and he was project managing Preferred's largest account at that time, Catholic Health East ("CHE"). (Piotrowski Dep. at 54-55).

Plaintiff disputes that he was not selling or performing well at his job. (Pl. Dep. at 109-11). Plaintiff claims that Seipenko had told him on multiple occasions that he would be better suited to working in an office with more men. (Pl. Dep. at 253-54). Plaintiff claims that Seipenko called the office a "girls club" and further testified that Chris Kulpa was called a cutie and harassed for being good-looking. (Pl. Dep. at 253-55). Plaintiff also speculated that Seipenko did not want to share the success of her company with a man. (Pl. Dep. at 254).

Plaintiff was certainly aware of Seipenko's problems with his performance in October of 2012, as evidenced by two emails. (*See* Ex. 9, 10/8/12 Email; Ex. 10, 10/30/2012 Email). Plaintiff stated in an October 8, 2012 email to Seipenko: "I want to tell you again that I feel terrible that I'm at the root of any problems for you or anyone else in the company." (Ex. 9). Plaintiff then went on to instruct Seipenko to answer some "fundamental" questions regarding her expectations of him and he would like to "swap notes and compare" to see if they are on the same page. (*Id*.).

After this email, Seipenko instructed Plaintiff to contact a client regarding a project that was set to begin at the same time Hurricane Sandy was projected to make landfall. (Seipenko Dep. at 205-06). Plaintiff refused to follow that instruction. Plaintiff

10

did not believe that Preferred should send consultants into the possible hurricane.  (*Id.*; Pl. Dep. 181).  Seipenko claims that Plaintiff flatly refused her directive to call the client to allow them to make a choice regarding whether the training should go on in light of the hurricane, and as a result of that insubordination, she openly questioned his ability to be a leader.  (Seipenko 204-05).  Plaintiff believed that Seipenko was not being a leader and fought her "tooth and nail" on the issue.  (Pl. Dep. at 182).  Plaintiff also claims that Seipenko only questioned his ability to be a leader after the consultants were flown to the site and stranded in hotels without power, and Plaintiff refused Seipenko's demand to "clean up her mess".  (Pl. Dep. at 184).

Regardless of the exact events, this encounter precipitated Plaintiff's October 30, 2012 email to Seipenko.  (Ex. 10).  In that email, Plaintiff stated that Seipenko questioned his "ability to be a leader at Preferred in the future" and noted that he has been "a leader and advisor" to Seipenko and built the HIT practice "from scratch".  (*Id.*).  Plaintiff also noted that he had received nothing but "resistance" from Seipenko.  (*Id.*).  Plaintiff concluded his email with an acknowledgment that his job was possibly in jeopardy, stating:  "I do not believe there is a justifiable reason to let me go and I hope that is not what you want to do."  (*Id.*).

D.     Change in Compensation

On May 3, 2013, Plaintiff was informed by Seipenko that his compensation would be changing from the 20% commission-only structure to a base salary of $100,000 and commission rate of 10% on the HIT business –  the same pay structure at which

11

Piotrowski was being compensated.  (Seipenko Dep. at 92).

Plaintiff contends that Seipenko told him during the impromptu meeting that "she was not happy that I made more money than Sue and ... would be cutting my pay to equalize it with Sue."  (Pl. Dep. at 226-7).  Seipenko testified that she changed Plaintiff's compensation structure as an attempt to motivate him to sell and discussed the decision with her father, the founder of Preferred and the chairman of the board.  (Seipenko Dep. at 94-96, 161, 164; Ex. 5, Butkovich Dep. at 31).  Seipenko disputes that she ever stated that was going to "equalize" Plaintiff's pay with Piotrowski, and maintained that she explained to him that she was not happy writing his checks because he was no longer performing and no longer selling.  (Seipenko Dep. at 93-94).  Seipenko testified that she changed Plaintiff's pay structure to the "only compensation model that made sense", the model Plaintiff was originally offered when he was hired, and the structure that Piotrowski was paid.  (*Id*. at 96).  Seipenko admitted she might have told Plaintiff that his compensation would be "the same as Sue's".  (*Id*.).

Plaintiff argues that his performance was not the issue and notes that Preferred had won the "Michigan 50 Companies to Watch Award" the day before his compensation was cut. (*See also* Purdy Decl. at 1-2, noting that while she worked for Plaintiff he was an exemplary employee and she observed no issues between Seipenko and Plaintiff).  Chris Kulpa who worked as a "prospector" looking for leads on HIT business for Preferred testified that he believed Plaintiff was performing his job as well as other employees. (Ex. 13, Kulpa Dep. at 58).  Plaintiff claims that Seipenko cut his pay because he was a

12

man and he was making more money that Piotrowksi.

Plaintiff protested the change and Seipenko agreed that the change would not take place until the third quarter of 2013 "to be fair". (Seipenko Dep. at 129). As a result, the change in Plaintiff's compensation became effective on July 1, 2013. (*Id*. at 262-63).

E.      2013 Employment

Plaintiff claims that after his compensation changed he worked on many deals, held sales calls, meetings, worked on master service agreements, and strategized with others to sell accounts. (Pl.'s Ex. K, Pl. Decl. at ¶¶ 3, 4, 5, 6).

 Eventually, it became apparent that there was a rift between Plaintiff and Piotrowski, Garner, and Seipenko regarding the direction Preferred should take to further its success. Plaintiff believed that Preferred should continue to focus on the EMR niche, namely "core services" while Piotrowski, Garner, and Seipenko believed they should look at moving in a different direction. (Pl. Dep. at 155-57; Ex. 12, Larner Dep. at 61-63; Kulpa Dep. at 60, testifying that Plaintiff's advocacy was "negatively" perceived.). Larner testified that Plaintiff voiced his opposition to this idea repeatedly and at times the behavior "crossed a line" and Larner advised Plaintiff to "pick his battles" and remember that he was not the CEO. (Ex. 12, Larner Dep. at 44:16, 58-59).

In mid-2013, it was decided that Plaintiff and Chris Kulpa would be dedicated solely to "core services" while Piotrowski, Garner and Larner would focus on "strategic sales". (Pl. Dep. at 159-60; Seipenko 169).

13

On November 25, 2013, Piotrowski sent Seipenko "SWAG" (or scientific wild ass guess) projections for the first half of 2014 which predicted a very fruitful year. (Pl.'s Ex. L, 11/25/13 Email).

F.    Termination

On or about December 2, 2013, Seipenko became aware that despite her directive that Plaintiff actively manage Kulpa, Kulpa had failed to enter any of his sales activity into a program called Salesforce. (Seipenko Dep. at 187-190). Seipenko believed that was evidence that Plaintiff was not managing Kulpa. (*Id*.). When Seipenko confronted Plaintiff on the issue he told her that it was not his problem. (*Id*.). Seipenko believed Plaintiff had undermined her and wondered what Plaintiff was doing if he was not selling product or managing Kulpa. (*Id*.).

On December 3, 2013, Seipenko met with Plaintiff in a conference room and terminated Plaintiff's employment. (Pl. Dep. at 320-21). Plaintiff claims that his termination was without notice or cause. (Pl. Dep. at 306, 321-22). Plaintiff testified that he was not aggressive during the meeting and did not slam furniture, but Plaintiff did admit that he called Seipenko a "black widow". (Pl. Dep. at 321-23). Plaintiff recorded a small portion of the termination meeting, during which Plaintiff stated that his performance based on "raw numbers" could not be questioned and pointed out that there was a record first half on the books for 2014 to which Seipenko responded: "I totally respect that." (Pl.'s Ex. M, recording). Seipenko testified that she agreed to everything Plaintiff was saying during their termination meeting in an attempt to calm him down and

14

be kind.  (Seipenko Dep. at 193).

Seipenko agreed to pay Plaintiff through the end of December 2013 but advised him she would not be paying him commissions beyond the fourth quarter of 2013. (Seipenko Dep. at 179).

Plaintiff and Preferred disagree as to whether the business in 2014 was pre-sold or a sure thing, as of the date of Plaintiff's termination.  Plaintiff and Preferred further disagree over the extent, if any, of Plaintiff's involvement in securing HIT business that was delivered in the first half of 2014.  It is clear from the record that generally business that Plaintiff and Piotrowski had "sold" was not delivered immediately, and was not counted as revenue until the services were actually delivered.  (Seipenko Dep. at 99-100, "We pay commissions when work is delivered, not sold.").  At times, the delivery of those services did not happen until some six months after the business was sold.  (*Id*., Seipenko testified that while the first quarter sale numbers for 2013 looked good, all of that business had been "sold" in 2012).

On February 17, 2014, Plaintiff filed this four count lawsuit alleging breach of contract, unjust enrichment, and violations of the federal Equal Pay Act, and Michigan's Elliott-Larsen Civil Rights Act.  (ECF No. 1).  Plaintiff does not challenge his termination as unlawful.

## II. STANDARD OF REVIEW

Preferred has moved for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure.  This rule provides that summary judgment "should be rendered if the

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of genuine issue of material fact."  *Id.* at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).  However, in making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment.  *Celotex*, 477 U.S. at 322-23.  The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial.  FED. R. CIV. P. 56(e).  The rule requires the non-moving party

to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

## III. ANALYSIS

A.   <u>Federal Equal Pay Act</u>

The Equal Pay Act, 29 U.S.C. § 206(d)(1), "prohibits employers from paying an employee at a rate less than that paid to an employee of the opposite sex for performing equal work." *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006). To establish a prima facie case of wage discrimination under the EPA a plaintiff must show that "an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Id*. (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). Unlike a Title VII claim based on disparate treatment, proof of discriminatory intent is not required to establish a prima facie case pursuant to the EPA. *Id*. at 360 (citation omitted).

Once a prima facie case is established under the EPA, the burden shifts to the defendant to "prove that the wage differential is justified under one of the four affirmative defenses set forth under § 206(d)(1) of the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Beck-Wilson*, 441 F.3d at 360 (quoting *Buntin v.*

17

*Breathitt County Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998)).  "An employer is entitled to summary judgment on one of the affirmative defenses 'only if the record shows that they established the defense so clearly that no rational jury could have found to the contrary.'"  *Foco v. Freudenberg-NOK Gen. Partnership*, 549 F. App'x 340, 344 (6th Cir. 2013) (quoting *Buntin*, 134 F.3d at 344-45).  If the employer can establish an affirmative defense, then the burden shifts to the plaintiff to produce evidence that those reasons are pretextual.  *Beck-Wilson*, 441 F.3d at 360.

The EPA also "expressly prohibits an employer who violates the Act from curing the violation by lowering the wages of male employees."  *EEOC v. Romeo Comm. Schools*, 972 F.2d 985, 988 (6th Cir. 1992).  The EPA states in relevant part: "[a]n employer who is paying a wage differential in violation of [the EPA] shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."  29 U.S.C. § 206(d)(1).  "The rationale for the Act's proscription on lowering wage rates is that '[t]he objective of equal pay legislation ... [i]s not to drag down men workers to the wage levels of women, but to raise women to the levels enjoyed by men in cases where discrimination is still practiced.'"  *Romeo Comm. Schools*, 972 F.2d at 988 (quoting *Corning Glass*, 417 U.S. at 207).

In the present case, Plaintiff claims that Preferred violated the EPA when it changed his pay structure from 20% commissions based on the gross profits of the HIT business practice to the same pay as Piotrowski (a woman), $100,000 base salary and 10% commissions based on gross profits of the HIT business practice.

Preferred appears to acquiesce that Plaintiff has established a prima facie case under the EPA where the result of Plaintiff and Piotrowski's pay structures resulted in Plaintiff making more money for the same job.  (Def.'s Br. at 16, not addressing prima facie case).  Preferred argues however that the difference in Plaintiff and Piotrowski's wages is attributable to a factor "other than sex."  Specifically, Preferred argues that the relevant facts are: (1) Plaintiff was offered the same pay structure as Piotrowski initially; (2) Plaintiff rejected the offer and negotiated a commission only compensation; and (3) Piotrowski was offered the same commission only compensation but rejected the offer because it was too risky.  Additionally, Preferred observes that at the time Seipenko agreed to pay Plaintiff on a commission only basis it was unknown whether Plaintiff or Piotrowski would earn more.  Preferred argues that these facts are clear evidence that "sex provide[d] no part in the basis for the wage differential".  *Timmer v. Mich. Dep't of Comm.*, 104 F.3d 833, 844 (6th Cir. 1997) (citation omitted).  Finally, Preferred notes, alternatively, that it also paid Plaintiff and Piotrowski based on a pay structure that measured earnings by the quantity and quality of Preferred's HIT business, which is also an affirmative defense under the EPA.

Plaintiff argues that Preferred's arguments fail because Piotrowski had no choice in her compensation.  Further, Plaintiff argues that Preferred cannot rely upon Plaintiff's better bargaining skills to evidence its affirmative defense because any case that relied upon negotiations as a "factor other than sex" has traced the wage negotiations to an employees's superior skills or education and an "employer cannot negotiate away an

19

employee's statutory rights to equal pay." *Howard Univ. v. Best*, 484 A.2d 958, 985 (DC 1984); (*see* Pl.'s Resp. at 23).

Indeed, the EPA's catch-all provision "does not include literally *any* other factor, but a factor that, at a minimum, was adopted for a legitimate business reason." *EEOC v. JC Penney Co.*, 843 F.2d 249, 253 (6th Cir. 1988) (citation omitted). Other courts have found that education or experience is a factor other than sex and consideration of a prior salary is also allowed, so long as it is not the sole justification for the wage disparity. *See Balmer v. HCA, Inc.*, 423 F.3d 606 (6th Cir. 2005) (collecting cases), *overruled on other grounds*, *Fox v. Vice* --- U.S. ---, 131 S. Ct. 2205 (2005). While Preferred argues that the pay differential was due to Plaintiff's better negotiation skills, such an argument is not exactly on point. Rather, the instant case is distinguishable from those cases relied upon by Preferred, because while it is true that Plaintiff negotiated his higher commission rate, Preferred *offered* Piotrowski *the same compensation structure* but she declined because of the risk associated with such a pay structure. *See e.g. Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446 (7th Cir. 1994) (finding that a negotiation of salary to previous position was evidence of a factor other than sex to defeat an EPA claim); *Underwood v. Sears, Roebuck and Co.*, 343 F. Supp. 2d 259, 271 (D. Del. 2004) (finding that male counterpart had negotiated a higher salary based on fact that he would have a longer commute and he was recruited from a rival store).

Plaintiff attempts to end around this fact by misconstruing the record and arguing that Piotrowski was unaware of Plaintiff's pay structure and that she had no choice

20

regarding her own pay structure.  These arguments are unavailing.  First, it is clear from Piotrowski's testimony that she rejected the compensation-only structure that Plaintiff chose.  (Piotrowski Dep. at 140-41; Seipenko Dep. at 237-38).  This fact is underscored by Plaintiff's own testimony that Piotrowski "wouldn't touch [his commission only pay structure] with a 10-foot pole" because of the high risk associated with such a compensation structure.  (Pl. Dep. at 81:15).  Second, it is irrelevant whether Piotrowski knew what Plaintiff was being paid when he was hired, because the testimony is clear that she rejected the exact same pay structure.  Indeed, this is further supported by the fact that even when Piotrowski knew that Plaintiff was making markedly more than her under the commission-only pay structure, she was still not interested in switching to the same plan. (Piotrowski Dep. at 120-21, 140-41; Pl. Dep. at 81).

In light of these facts, Preferred has shown that Plaintiff and Piotrowski's compensation differential was based on a factor other than sex - namely personal choice regarding the risk associated with the compensation structure.  Therefore, there was no "violation" of the EPA that Preferred could have attempted to fix by adjusting Plaintiff's compensation.

Plaintiff also attempts to argue that *Bence v. Detroit Health Corp*., 712 F.2d 1024 (6th Cir. 1983) is controlling, and provides that Preferred cannot assert a defense based on the "any factor other than sex" and that Plaintiff and Piotrowski's differing commission rates evidence an EPA violation.  In *Bence*, men and women managers employed by a chain of health spas that was divided into a men's division (operated by men) and a

21

women's division (operated by women) that operated on alternate days.  *Id*. at 1025-26.

The managers were compensated at different commission rates based on their gross sales

of memberships (e.g. men managers were paid 7.5% on the spa's gross sales of

memberships to men, while female managers were paid 5% of the gross sales of

memberships to women).  *Id*. at 1025-26.  These managers sold spa memberships only to

members of their own gender.  *Id*.

   The Sixth Circuit held in *Bence* that segregating women and men into separate

divisions "*plus* the application of a lower commission rate *only* to those who sold

memberships to women effectively locked female employees, and only female

employees, into an inferior position regardless of their effort or productivity."  *Id*. at 1031

(emphasis in original).   The Sixth Circuit held that in this "narrow" circumstance, "an

employer may not avail itself of the affirmative defense under ["the any factor other than

sex" provision of § 206(d)(1)] where it compensates male and female employees solely

for selling the exact same product, only female employees can be compensated at a lower

rate, and the differential is not justified by any difference in economic benefit to the

employer."  *Id*.

   First, the Court notes that the Sixth Circuit stated explicitly that the holding in

*Bence* is a narrow one.  Second, Plaintiff's argument that Piotrowski and Plaintiff were

similar to the employees in *Bence* because they sold the same items but were

compensated at a different commission "rate" is slightly disingenuous, where the

employees in *Bence* were paid on a commission-only basis and assigned differing

commission rates <u>based on their sex</u>.  In *Bence*, the defendant company unilaterally attempted to equalize the pay of its men and women to achieve "equal total remuneration" through the use of different commission rates.  However, in *Bence* the employees were not afforded a choice in their compensation, nor does it appear that any person would *ever choose a lower commission rate* when paid based *only* on commissions.  Indeed, the Sixth Circuit noted that "[s]ince the lower commission rate could apply only to women, we do not believe [the] employer has proven that 'sex provided no part of the basis for the wage differential.'" *Id*. at 1031 (citation omitted).  In the instant case, Plaintiff and Piotrowski's pay structures were different because one was commission only, and the other included a base salary of $100,000 plus a lesser commission.  Moreover, *Bence* is distinguishable because Piotrowski was offered and she rejected the compensation structure that Plaintiff negotiated and received.  Hence, Preferred has proven that sex provided no reason for Plaintiff and Piotrowksi's differing pay structures because ultimately Piotrowski's personal choice (and willingness to accept risk) dictated the difference – not sex.

Finally, Plaintiff does not attempt to set forth evidence that this "other reason" is a pretext for discrimination.  Indeed, given Piotrowski's and Plaintiff's testimony regarding Piotrowski's rejection of the identical compensation structure Plaintiff received, and her continued disinterest in changing her pay structure, pretext cannot be found.

For all these reasons, the Court finds that summary judgment is appropriate on Plaintiff's EPA claim.

B.      State Law Claims

Plaintiff's remaining claims for breach of contract, violations of Michigan's Elliott-Larsen Civil Rights Act, and unjust enrichment are all state law claims.  Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over pendant state law claims when the federal claims over which it had original jurisdiction have been dismissed. The Sixth Circuit has noted that generally, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson Theatrical, Inc. v. Federal Exp. Corp.*, 89 F.3d 1244-55 (6th Cir. 1996); *see also Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991).

In the present case, where the Court has dismissed the only claim over which it had original jurisdiction, the Court, in its discretion, declines to exercise supplemental jurisdiction over the Plaintiff's remaining state law claims.  Accordingly, the Court will dismiss those claims without prejudice.


IV. CONCLUSION

For all these reasons, the Court GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's Equal Pay Act claim and dismisses the Equal Pay Act claim WITH PREJUDICE.

24

Further, the Court declines to exercise supplemental jurisdiction over Plaintiff's

remaining state law claims and DISMISSES those claims WITHOUT PREJUDICE.

IT IS SO ORDERED.


s/Paul D. Borman\
PAUL D. BORMAN\
UNITED STATES DISTRICT JUDGE

Dated:  May 18, 2015



CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each
attorney or party of record herein by electronic means or first class U.S. mail on May 18,
2015.


s/Deborah Tofil\
Case Manager